# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

IN RE GRAND JURY PROCEEDINGS
SUBPOENA TO TESTIFY TO:

MIRYAM ANTÚNEZ DE MAYOLO,

KENNETH BIRKER and BIRKER, INC.,

    Appellants.

No. 06-MC-64-LRR

**ORDER**

_____

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
III.   MAGISTRATE JUDGE'S ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.    *Factual Findings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      B.    *Conclusions of Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           1.    *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           2.    **In camera** *review of the seized documents* . . . . . . . . . . . . . . . 5
IV.   ARGUMENTS ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
V.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.    *Required Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      B.    *Discretionary Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
VI.   FACTUAL FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
VII.  MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      A.    *Does the Attorney-Client Privilege Protect the*
           *Communications between Antúnez de Mayolo and Targets?* . . . . . . 8
           1.    *Powers of the grand jury* . . . . . . . . . . . . . . . . . . . . . . . . 8
           2.    *Elements of the attorney-client privilege* . . . . . . . . . . . . . . . 9
           3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                a.    *Client status* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                b.    *Legal advice, service or assistance* . . . . . . . . . . . . . . 11

        c.      *Waiver* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
        d.      *A new exception?* . . . . . . . . . . . . . . . . . . . . . . . . . *13*
        e.      *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*
    B.    **Does the Crime-Fraud Exception Apply?** . . . . . . . . . . . . . . . . . . . **18**
*VIII.* **IN CAMERA** *REVIEW OF THE SEIZED DOCUMENTS* . . . . . . . . . . . *19*
*IX.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

## *I. INTRODUCTION*

The matter before the court is the Appeal of Magistrate Decision to District Court ("Appeal") (docket no. 14), which was filed by Kenneth Birker and Birker, Inc. (collectively referred to as "Targets").

## *II. PROCEDURAL BACKGROUND*

The grand jury is investigating Targets for possible violations of 8 U.S.C. § 1324 (Harboring Illegal Aliens) and 18 U.S.C. § 1001 (Making a False Statement). On October 12, 2006, a grand jury subpoena was issued to Attorney Miryam Antúnez de Mayolo. The subpoena ordered Antúnez de Mayolo to appear and testify before the grand jury on October 18, 2006, and, in an attachment, commanded her to bring all records "relating to [Targets], for the time period June 2000, to the present." Gov't Ex. 1. On October 17, 2006, Immigration and Customs Enforcement ("ICE") Special Agent Christopher Cantrell ("Special Agent Cantrell") served the subpoena.[1]

On October 17, 2006, Targets filed an Emergency Motion to Quash Subpoena ("Motion"). On October 23, 2006, the government filed a Resistance. On October 24, 2006, a United States magistrate judge held an evidentiary hearing ("Evidentiary Hearing"). On February 22, 2007, the magistrate judge issued an Order ("Order") (docket no. 7), in which he denied the Motion.

---

[1] Antúnez de Mayolo denies that she received the attachment.

On March 8, 2007, Targets filed the instant Appeal.[2] On March 20, 2007, the government filed a Response. On March 22, 2007, the court held a hearing ("Appeal Hearing"). Attorney Renée V. Sneitzer represented Targets. Assistant United States Attorney Peter E. Deegan, Jr. represented the government. The Appeal is fully submitted and ready for decision.[3]

### III. MAGISTRATE JUDGE'S ORDER

#### A. Factual Findings

In the Order, the magistrate judge found the following facts:

> On September 19, 2006[,] the government executed a search warrant at Birker's farm and . . . arrested undocumented aliens Jose Alfredo Tinajero-Uribe . . . and Alejandra Sarabia-Lule . . . , husband and wife . . . . Tinajero-Uribe and Sarabia-Lule illegally entered the United States from Mexico more than five years ago. For approximately the past five years, Birker employed Tinajero-Uribe and Sarabia-Lule at his dairy farm.
>
> Tinajero-Uribe and Sarabia-Lule testified in material witness depositions[4] that they contacted [Antúnez de Mayolo] approximately two years prior to their arrest in order to take steps to legalize their status. They met with [Antúnez de

---

[2] On March 2, 2007, Targets filed a Notice of Appeal to the Eighth Circuit Court of Appeals and Request for Stay ("Notice of Appeal"). On March 8, 2007, Targets withdrew their Notice of Appeal and filed the instant Appeal. The instant Appeal was styled as a Motion to Recast and Replead the Notice of Appeal.

[3] Pursuant to the court's March 16, 2007 Order (docket no. 17), the cases cited therein, the magistrate judge's ruling at the Evidentiary Hearing and Federal Rule of Criminal Procedure 6(e)(3)(i) all proceedings in this matter are open proceedings.

[4] Gov't Ex. 4 (Tinajero-Uribe); Gov't Ex. 5 (Sarabia-Lule). On October 18, 2006, Tinajero-Uribe and Sarabia-Lule waived the attorney-client privilege between themselves and Antúnez de Mayolo. Gov't Ex. 2 (Waiver of Tinajero-Uribe); Gov't Ex. 3 (Waiver of Sarabia-Lule).

> Mayolo] at her office. Approximately 15 days [later], Tinajero-Uribe, Sarabia-Lule, Birker and Bonnie Birker[, Birker's sister,] met with [Antúnez de Mayolo] at the Birker farm. At his deposition, Tinajero-Uribe testified that [Antúnez de Mayolo] discussed "the form that she was going to send him so that he can sign." Sarabia-Lule testified that [Antúnez de Mayolo] and Birker discussed what Birker would have to do "so that can fix the paper legal in this country." At some point, Tinajero-Uribe and Sarabia-Lule paid [Antúnez de Mayolo] half of her customary fee ($2500).
>
> After several months passed, Tinajero-Uribe and Sarabia-Lule contacted [Antúnez de Mayolo] to check on how her work was progressing. [Antúnez de Mayolo] told Sarabia-Lule that she was waiting for Birker to place an advertisement in the paper. [Antúnez de Mayolo] told Tinajero-Uribe that Birker would not return her telephone calls and therefore the paperwork could not proceed. Tinajero-Uribe asked Birker why he would not return [Antúnez de Mayolo's] calls[,] and Birker told Tinajero-Uribe that it was because Birker was busy working in the fields.
>
> On September 20, 2006[,] Birker told ICE agents that he had been in contact with [Antúnez de Mayolo] approximately two years earlier through Tinajero-Uribe and Sarabia-Lule. Birker stated that he provided information about his farm to [Antúnez de Mayolo] via email as part of the process to apply for labor certificates, that the process was pending, and that he never paid any money to [Antúnez de Mayolo]. On the same day, [Antúnez de Mayolo] informed an ICE agent via telephone that she represented Tinajero-Uribe and Sarabia-Lule, had been in contact with Birker regarding labor certificates for Tinajero-Uribe and Sarabia-Lule, and had never received any money from Birker. She stated that Birker "changed his mind regarding the labor certificates in or about March 2005 when the regulations regarding labor certificates changed."

Order at 1-3 (footnotes omitted).

### B. Conclusions of Law

#### 1. *Motion*

In the Motion, Targets asserted that Antúnez de Mayolo's testimony and the documents requested in the subpoena were subject to attorney-client privilege and, therefore, the grand jury subpoena must be quashed. The government resisted the Motion. The government claimed that Birker and Antúnez de Mayolo did not have an attorney-client relationship. Alternatively, the government claimed that, even if there was an attorney-client relationship, the crime-fraud exception applies.

The magistrate judge assumed without deciding that Birker and Antúnez de Mayolo had an attorney-client relationship. The magistrate judge found that Birker knew or should have known after meeting with Antúnez de Mayolo that Tinajero-Uribe and Sarabia-Lule did not have legal status and yet continued to employ them. Relying upon *In re Grand Jury Proceedings*, 87 F.3d 377 (9th Cir. 1996), the magistrate judge held that the crime-fraud exception to the attorney-client privilege applied. Accordingly, the magistrate judge denied the Motion and ordered Antúnez de Mayolo to appear before the grand jury, testify and bring the requested documents.

#### 2. **In camera** *review of the seized documents*

At the Evidentiary Hearing, counsel for the government pointed out that ICE agents had seized a number of documents during the search of Birker's farm. Because the documents appeared to come from an attorney, ICE designated a special "taint" agent. The taint agent refused to give other agents or counsel for the government access to the seized documents without the court's approval.

Over Targets' objection, the magistrate judge indicated in the Order that he would conduct an *in camera* review of the seized documents, in order to determine whether they are privileged. Relying upon *United States v. Zolin*, 491 U.S. 554 (1989), the magistrate judge held that the government had presented "evidence sufficient to support a reasonable

5

Case 1:06-mc-00064-LRR    Document 21    Filed 04/16/07    Page 5 of 20

belief that *in camera* review may yield evidence that establishes the exception's applicability." 491 U.S. at 574-75. Pending the resolution of the Appeal, however, neither the undersigned nor the magistrate judge viewed the seized documents, which are now under seal and in the possession of the Clerk of Court as Government Exhibit 6.

## IV. ARGUMENTS ON APPEAL

In the Appeal, Targets object to the magistrate judge's holdings that: (1) the crime-fraud exception applies and (2) an *in camera* review of the seized documents is appropriate. The government generally defends the Order but maintains that Targets and Antúnez de Mayolo did not have an attorney-client relationship.

## V. STANDARD OF REVIEW

### A. Required Review

At the Appeal Hearing, the parties agreed that the court should review Targets' objections to the Order for clear error pursuant to Federal Rule of Criminal Procedure 59(a). Rule 59(a) governs appeals of nondispositive magistrate judge orders in criminal cases. A motion to quash a grand jury subpoena is a nondispositive matter. *Cf. Etten v. U.S. Food Serv., Inc.*, 2006 WL 1390395, *4 (N.D. Iowa May 19, 2006) (holding, in a civil case, that "[t]he resolution of a motion to quash a subpoena is clearly a nondispositive matter"). Likewise, a decision whether to review *in camera* documents for the existence of a privilege, which is akin to the resolution of a motion to compel in a civil case, is nondispositive. *Cf. Sunview Condo. Ass'n v. Flexel Int'l, Ltd.,* 116 F.3d 962, 964 (1st Cir. 1997) (concluding that a motion to compel discovery in a civil case was a nondispositive matter that the district court was required to review for clear error); *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231-RCL, 2007 WL 915235, *1 (D.D.C. Mar. 27, 2007) (reviewing magistrate judge's decision that documents were subject to attorney-client privilege for clear error). Therefore, the court must review the objected-to portions of the Order and inquire as to whether they are clearly erroneous

6

or contrary to law. Fed. R. Crim. P. 59(a).

A finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 507-08 (8th Cir. 2004) (citation and internal quotation marks omitted). "'To be clearly erroneous, a decision must strike [the reviewing court] as more than just maybe or probably wrong; it must . . . strike [the reviewing court] as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *In re Papio Keno Club, Inc.*, 262 F.3d 725, 729 (8th Cir. 2001) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)). Where there are two permissible views of the evidence, the magistrate judge's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

### B. Discretionary Review

A district court judge retains the authority to review *de novo* any aspect of a magistrate judge's ruling on a nondispositive matter in a criminal case, even if neither party files a timely objection. *See* Fed. R. Crim. P. 59 advisory committee's note ("[T]he district judge retains the authority to review any magistrate judge's decision or recommendation whether or not objections are timely filed."); *see, e.g., United States v. Tooze*, 236 F.R.D. 442, 446 (D. Ariz. 2006) ("No language in [Rule 59(a)] precludes discretionary review by district courts, and the Advisory Committee Notes make clear that such discretion remains . . . ."). Although the district court judge is not *required* "to review an issue *de novo* if no objections are filed, [nothing] preclude[s] further review by the district [court] judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154 (1985) (discussing authority of magistrate judges).

### VI. FACTUAL FINDINGS

Targets do not specifically challenge any of the magistrate judge's factual findings.

7

Rather, Targets claim that the government has not, as a matter of law, presented sufficient facts to trigger the crime-fraud exception to the attorney-client privilege. Accordingly, the court is not required to review the magistrate judge's factual findings. Fed. R. Crim. P. 59(a). Out of an abundance of caution, however, the court has independently reviewed the magistrate judge's factual findings and holds that they are not clearly erroneous or contrary to law. *Id.*

## VII.  MOTION

### A. *Does the Attorney-Client Privilege Protect the Communications Between Antúnez de Mayolo and Targets?*

As indicated, the magistrate judge did not decide the threshold legal issue in this case: whether the attorney-client privilege protects the communications between Antúnez de Mayolo and Targets.[5] In the Appeal, however, Targets state that the magistrate judge "concluded that the relationship between [Targets and Antúnez De Mayolo] did in fact constitute a privileged relationship." In light of Targets' characterization of the magistrate judge's order, the court shall exercise its discretion, *see supra* Part V.B., and inquire as to the existence of the privilege. To the extent necessary, the court shall review the record *de novo* and include additional factual findings in its analysis.

####    1.     *Powers of the grand jury*

A grand jury has broad investigatory powers to subpoena individuals and documents. *United States v. R. Enters., Inc.*, 498 U.S. 292, 298 (1991). "'[I]ts operation [is] generally unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 343 (1974)). That said, the investigatory powers of the grand jury are not unlimited. *Id.* at

---

[5] The parties do not distinguish between Birker and Birker, Inc., and thus the court assumes that the privilege, if it applies, applies equally to Birker and Birker, Inc. *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 606, 608 (8th Cir. 1978) (en banc) ("The attorney-client privilege applies to corporations.").

300. The grand jury "may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law." *Calandra*, 414 U.S. at 346. Accordingly, "[g]rand juries are subject to judicial control and [their] subpoenas [are subject] to motions to quash." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972).

"On motion made promptly, the court may quash . . . [a] subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). A grand jury subpoena that violates the attorney-client privilege is unreasonable and oppressive. *See, e.g., Swidler & Berlin v. United States*, 524 U.S. 399, 411 (1998) (quashing grand jury subpoena, because it called for information that was protected by the attorney-client privilege); *In re Subpoenaed Grand Jury Witness*, 171 F.3d 511, 513 (7th Cir. 1999) ("[G]rand juries must respect common law privileges, including that of attorney-client . . . .")

### 2. *Elements of the attorney-client privilege*

The Federal Rules of Evidence do not specifically provide for an attorney-client privilege. Rather, Rule 501 provides generally that "[t]he privilege of a witness . . . [is] governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. Accordingly, the court "must . . . apply the federal common law of attorney-client privilege to the situation presented by this case." *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915 (8th Cir. 1997).

According to the Eighth Circuit Court of Appeals,

> "[t]he [attorney-client] privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion

9

on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

*Diversified Indus. v. Meredith*, 572 F.2d 596, 601-02 (8th Cir. 1977) (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)), *aff'd in part and vacated in part*, 572 F.2d 606 (8th Cir. 1978) (en banc). Targets, as the parties asserting the attorney-client privilege, bear the burden to establish it. *Boushor v. United States*, 316 F.2d 451, 457 (8th Cir. 1963).

### 3. Analysis

The court holds that Targets have failed to prove that the attorney-client privilege protects any communications with Antúnez de Mayolo. Specifically, the court holds that: (1) Targets were not and did not seek to become Antúnez de Mayolo's clients; (2) Targets did not communicate with Antúnez de Mayolo for the purpose of securing any legal advice, service or assistance; and (3) any such communications were made in the presence of a stranger and, therefore, Targets waived any privilege.

#### a. Client status

The court finds that Targets were not, and did not seek to become, Antúnez de Mayolo's clients. Targets did not sign a written contract with Antúnez De Mayolo. Targets never paid Antúnez de Mayolo a legal fee. Indeed, Targets and Antúnez de Mayolo did not even discuss the possibility of a fee. Rather, the court finds that Tinajero-Uribe and Sarabia-Lule sought to be and were Antúntez de Mayolo's clients. Tinajero-Uribe and Sarabia-Lule signed a written contract with Antunez de Mayolo and paid her fee.[6]

The court recognizes that Antúnez de Mayolo testified that she and Targets had a

---

[6] Based upon Sarabia-Lule's testimony, the court finds that Tinajero-Uribe and Sarabia-Lule paid Antúnez de Mayolo $2500 before the meeting at the Birker farm.

10

"verbal agreement." The court finds that Antúnez de Mayolo's testimony on this matter is not credible. When specifically and repeatedly questioned by the magistrate judge about such agreement, Antúnez de Mayolo's testimony was remarkably vague.[7] She could not remember who initiated the agreement. She could not recall the words of the agreement. When the magistrate judge asked Antúnez de Mayolo what was communicated to suggest that she had an attorney-client relationship with Targets, she testified that she could not recall anything specific. Further, Antúnez de Mayolo's testimony does not sit well with her prior statements to Special Agent Cantrell. Antúnez de Mayolo told Special Agent Cantrell that her "clients" were Tinajero-Uribe and Sarabia-Lule; even though Antúnez de Mayolo and Special Agent Cantrell talked about Birker, she did not refer to Targets as her "clients."

### b. *Legal advice, service or assistance*

The court finds that Targets never sought out legal advice, service or assistance from Antúnez de Mayolo. Although Birker and Antúnez de Mayolo met on one occasion, such meeting was arranged at Tinajero-Uribe's request. The sole purpose of the meeting was to further Antúnez de Mayolo's representation of Tinajero-Uribe and Sarabia-Lule, *i.e.*, to help Tinajero-Uribe and Sarabia-Lule obtain authorization to work in the country legally. Antúnez de Mayolo met with Birker on behalf of Tinajero-Uribe and Sarabia-Lule in order to convince Birker to put an advertisement in the newspaper—an important step in legalizing their employment. At no time did Birker seek legal advice from Antúnez de Mayolo for himself or for Birker, Inc.

### c. *Waiver*

Targets have not shown that any communications with Antúnez de Mayolo were

---

[7] In the words of the magistrate judge, Antúnez de Mayolo's "recollections and the wording of her affidavit are particularly vague as to the formation of a privileged relationship." Order at 6.

made in confidence. The common law rule of attorney-client privilege extends only to *confidential* communications from a client to his or her attorney. *In re Grand Jury Proceedings (85 Misc. 140)*, 791 F.2d 663, 665 (8th Cir. 1986) (emphasis in original); *see Bouschor*, 316 F.2d at 457 ("[I]n order for the privilege to be invoked, the communication must have been one between attorney and client and it must have been made in confidence."). Targets' communications with Antúnez de Mayolo knowingly occurred in the presence of a "stranger," Bonnie Birker. There is no evidence in the record that Bonnie Birker was anything more than "a casual disinterested third person within hearing," and thus her presence "demonstrate[s] that the communication was not intended to be confidential." *McCormick on Evidence* § 91 & n.9 (6th ed. 2006); *see, e.g., United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (holding that inmates' telephone conversations with their lawyers were not privileged, because the inmates and the lawyers were aware that the conversations were being recorded); *York v. United States*, 224 F. 88, 91 (8th Cir. 1915) ("[T]he presence of a third party . . . indicates that the communication is not confidential or privileged." (Citations omitted.)). Although Bonnie Birker and Birker were related, her presence was not reasonably necessary or useful. *See McCormick on Evidence* § 91 & n.16; *accord* Graham C. Lilly, *An Introduction to the Law of Evidence* 465 (3d ed. 1996) ("The client-protected circle generally embraces . . . family and friends *so long* as their involvement is necessary or at least reasonably useful."). In other words, the presence of Bonnie Birker means that Targets waived any privilege, because any communication was voluntarily disclosed to a third party. *See United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) ("Voluntary disclosure of attorney client communications expressly waives the privilege . . . .").[8]

---

[8] It is unclear whether the presence of Tinajero-Uribe and Sarabia-Lule at the meeting also waives any attorney-client privilege between Targets and Antúnez de Mayolo. *See In re Grand Jury Subpoena*, 274 F.3d 563, 573 (1st Cir. 2001) ("The instance of a
(continued…)

12

### d. A new exception?

Notwithstanding the fact that Targets have failed to establish the elements of the attorney-client privilege under governing law, they urge the court to carve out an exception for attorneys and clients in immigration matters.[9] Targets opine—and Antúnez de Mayolo testified—that, once Antúnez de Mayolo undertook representation of Tinajero-Uribe and Sarabia-Lule and met with Birker on their behalf, she was *ipso facto* representing Targets, because of the "dual representation doctrine" for immigration cases.

At the Evidentiary Hearing, Targets offered into evidence an article on dual representation in immigration practice. Targets' Ex. 1.[10] The author of the article explains:

> Dual (or multiple) representation occurs when a lawyer represents two (or more) co-clients in a single matter. In most areas of law practice, dual representation is relatively uncommon. In immigration practice, however, it is very common, because many immigration benefits, such as family-based or work-related immigration status, involve joint action by an alien beneficiary and an employer-petitioner or a

---

[8](…continued) criminal investigation in which one former co-client is willing to aid in the prosecution of the other lies in the wasteland between . . . two doctrinal strands, and courts have split on whether the target of the prosecution may block disclosure in this context." (Citations omitted.)). Writing in the immigration context, however, one author opines that it would. *See* Targets' Ex. 1 at 35 ("If a lawyer jointly represents two or more clients with respect to the same matter, the clients ordinarily have no expectation that their communications with the lawyer, with respect to the joint matter, will be kept from each other.").

[9] A similar argument appears in *DerKervorkian v. Lionbridge Techs., Inc.*, No. CIV04CV01160LTBCBS, 2006 WL 898142, *4 (D. Colo. Apr. 3, 2006).

[10] Targets' Exhibit 1 is a condensed and revised version of Bruce A. Hake, *Dual Representation in Immigration Practice: The Simple Solution is the Wrong Solution*, 5 Geo. Immigr. L.J. 581 (1991). Targets' Exhibit 1 is available online at http://www.aila.org/content/default.aspx?docid=16565 (last visited April 12, 2007).

> U.S. citizen (or permanent resident).

Targets' Ex. 1 at 30. According to Targets, the dual representation doctrine holds that, whenever an attorney represents a prospective employee-beneficiary and meets with the prospective employer-petitioner, the attorney also represents the prospective employer-petitioner—*no matter what*.[11] The author of Targets' Exhibit 1 opines:

> [I]n all immigration cases involving a petitioner and a beneficiary, the lawyer has a lawyer-client relationship with both the petitioner and the beneficiary, with only one exception. The only exception are [sic] situations where the petitioner and the beneficiary are each represented by a different lawyer. The law may evolve to carve out exceptions and nuances. At the moment, however, this principle stands, no matter who started the relationship with the lawyer, no matter who pays the fee, no matter how attenuated the lawyer's contact may be with petition or beneficiary, and even no matter if the lawyer has attempted to exact a disclaimer of representation from either petitioner or beneficiary.

Targets' Ex. 1 at 28.

At the Evidentiary Hearing, Antúnez de Mayolo testified that, as an experienced and practicing attorney, the dual representation doctrine is a common practice in immigration matters. She testified:

> The fact that someone comes to me, contacts me seeking my advice and my assistance in obtaining, for instance, let's say permanent residence, and that by itself doesn't make me an attorney, but once I start acting on behalf of that person and then if I have a contact with that person's employer, then even if there is not a contract . . . among all of us, I am

---

[11] Indeed, when asked "if by representing the Tinajeros whether you necessarily had to represent Mr. Birker," Transcript of Evidentiary Hearing at 43, Antúnez de Mayolo answered "yes." *Id.* When the magistrate judge asked Antúnez de Mayolo whether another attorney could have represented Birker, however, Antúnez de Mayolo also said "yes." *Id.*

14

representing . . . all the parties involved.

Transcript of Evidentiary Hearing at 10. In other words, when Antúnez de Mayolo met Birker, she immediately had "a duty of loyalty to both parties." *Id.* at 11. Counsel for Targets avers that, "the minute that . . [Antúnez de Mayolo] met with Birker, . . . that dual representation took place."

The court can find no support for Targets' position in governing Supreme Court or Eighth Circuit Court of Appeals law. Further, such an interpretation of the doctrine is in tension with traditional understandings of the attorney-client privilege. The attorney-client privilege is generally strictly construed, because it inhibits the search for truth. *Diversified Indus.*, 572 F.2d at 602. "Privileges . . . are not lightly created nor expansively construed . . . ." *Grand Jury Subpoena Duces Tecum*, 112 F.3d at 918 (citation and internal quotation marks omitted). "[T]he attorney-client relationship does not create a 'cloak of protection draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client.'" *Subpoenaed Grand Jury Witness*, 171 F.3d at 513 (quoting *United States v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir. 1964)). Targets' understanding of the attorney-client privilege also appears to run afoul of the principle that "an evidentiary showing based on competent evidence"—not "mere conclusory or *ipse dixit* assertions"—is required to establish the privilege. *Bowne of New York City, Inc. v. Ambase Corp.*, 150 F.R.D. 465, 474-75 (S.D.N.Y. 1993) (citations and internal quotation marks omitted).

Ultimately, however, the court need not decide whether there is a unique dual representation doctrine in immigration matters. Even if the Eighth Circuit Court of Appeals were to recognize such a doctrine, it would not recognize it under the circumstances present in this case.

In the typical labor-certification representation, the employer and alien are acting lawfully. For example, an employer in the United States seeks to bring an alien into the

15

country on a valid work visa or adjust the status of an alien who is already in the country lawfully. In such cases, the interests of the employer and the alien are aligned, and thus the duty of the lawyer with respect to each is the same: namely, to help the alien obtain permission to work in this country legally.

The same cannot be said when, as here, both the employer and the alien are engaged in illegality at the time the lawyer undertakes her representation of the alien. As the magistrate judge pointed out, when Antúnez De Mayolo began to represent Tinajero-Uribe and Sarabia-Lule, she was "duty bound" to try her hardest help them obtain authorization to work in this country legally. If she also undertook to represent Targets, however, she would have an immediate conflict of interest: she would be "duty bound" to advise Targets to fire Tinajero-Uribe and Sarabia-Lule, lest Targets continue to illegally employ them.[12]

Even those authors that urge a broad view of the dual representation doctrine have recognized that attorneys such as Antúnez de Mayolo knowingly place themselves in a precarious ethical situation when they undertake to represent an employer and an employee when both the employer and the employee are engaged in illegal activity. One such author writes:

> [There is] a very serious potential conflict between employers and aliens. [I]t [is] unlawful for an employer to employ aliens not authorized to work in the United States and [there are] serious penalties for [such] violations. . . . In many employment-based immigration scenarios, an unauthorized alien has been working illegally for an employer, then either the alien or the employer seeks to stabilize the alien's immigration status in the United States by establishing his permanent residency. . . . [The government] screens labor certification applications for evidence of . . . violations. [L]abor certification [is thus] a risky process both for aliens

---

[12] Indeed, it appears the conflict of interest harmed the clients in this case. Once Birker decided not to pursue labor certification, Antúnez de Mayolo did very little for Tinajero-Uribe and Sarabia-Lule, even though they had paid her a substantial sum.

16

who have previously engaged in unauthorized work who are now seeking an employment-based visa and for employers who have hired illegal aliens. In essence, by filing a labor certification application, the employer may have to acknowledge the fact that it has employed an alien without authorization and open itself to potential exposure, investigation, and fines. Thus, for the immigration attorney, [there is a] likelihood of a potential conflict of interest . . . , and of a possible violation of the ethical rules. [I]f the alien initially retains the attorney, the attorney may have an ethical obligation to inform the employer of the potential . . . investigations and the liability that may ensue from the employer filing labor certification on behalf of the alien. However, communicating this information to the employer may hinder the alien's opportunity to gain legal permanent status in the United States, the very objective for which the attorney was retained . . . .

Panteha Abdollahai, *The Labor Certification Process: Complex Ethical Issues for Immigration Lawyers*, 17 Geo. Immigr. L.J. 707, 717-18 (2003).[13]  Given the obvious

---

[13] Another author advises immigration attorneys

> to make clear to all concerned that the case involves dual representation and what that means. . . . All parties should be advised in writing regarding the nature of the representation, what will happen in the event of conflicts, and what is expected regarding confidential information. In particular, it should be explained in writing that representing two parties simultaneously in one matter requires the lawyer to disclose information and to be equally loyal to both parties. . . . When a conflict of interest develops, the lawyer cannot take sides or pretend the conflict does not exist. Instead, the lawyer must try to resolve the conflict, and if that is impossible, must withdraw from representing both parties in that particular matter.

(continued…)

conflicts of interest that were apparent at the outset of any purported representation, it was not reasonable for either Antúnez de Mayolo or Targets to believe that their communications would remain privileged if Tinajero-Uribe and Sarabia-Lule later waived attorney-client privilege. Accordingly, even if the dual representation doctrine is as broad as Targets suggest, the attorney-client privilege would still not protect the communications at issue here. *Cf. Sky Valley P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 662 (N.D. Cal. 1993) ("[A] showing that there has been, is, or is likely to be considerable conflict of interest between the two pertinent parties would be one consideration . . . tending to support a conclusion that it was unreasonable for one the parties to believe that it was jointly a client of the other party's lawyer.").

### *d.  Summary*

Accordingly, the court holds that Targets have not proven that the attorney-client privilege protects their communications with Antúnez de Mayolo.

### *B.  Does the Crime-Fraud Exception Apply?*

The magistrate judge held that, even if an attorney-client relationship existed between Antúnez and Targets, the crime-fraud exception applies. Targets object to this legal finding.

"[I]t is well-established that the attorney-client privilege 'does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.'" *In re BankAm. Corp. Secs. Litig.*, 270 F.3d 639, 641 (8th Cir. 2001) (quoting *Zolin*, 491 U.S. at 563). To invoke the crime-fraud exception, the government bears the burden to establish that Targets "[were] engaged or planning or planned to engage in illegal or fraudulent activity when [they sought Antúnez de Mayolo's] legal advice." *In*

---

[13](…continued)
Targets' Ex. 1 at 28-29. Here, there is no evidence that Antúnez De Mayolo apprised either Tinajero-Uribe and Sarabia-Lule or Targets of the nature and consequences of dual representation or obtained a waiver of any potential conflicts of interest.

18

*re Murphy*, 560 F.2d 326, 337 (8th Cir. 1977).

The court holds that the magistrate judge's holding is not clearly erroneous or contrary to law. The court agrees that this case is materially indistinguishable from *In re Grand Jury Proceedings*, 87 F.3d 377 (9th Cir. 1996). As *In re Grand Jury Proceedings*, the employer continued his illegal employment practices after the consulting with the attorney.

### VIII.  IN CAMERA *REVIEW OF THE SEIZED DOCUMENTS*

In a separate matter, the magistrate judge indicated in the Order that he would conduct an *in camera* review of the seized documents, in order to determine whether they are privileged. The court holds that the magistrate judge's ruling is not clearly erroneous or contrary to law.

### IX.  CONCLUSION

**IT IS THEREFORE ORDERED:**

(1) The magistrate judge's Order (docket no. 7) is **AFFIRMED AS MODIFIED**;

(2) The Motion (docket no. 1) is **DENIED**; and

(3) The Clerk of Court is directed to forward a copy of the instant Order to the Iowa Supreme Court Attorney Disciplinary Board, Judicial Branch Building, 1111 East Court Avenue, Des Moines, Iowa 50319, for investigation of possible violations of the Iowa Rules of Professional Conduct (or its predecessor, the Iowa Code of Professional Responsibility for Lawyers) on the part of Attorney Miryam Antúnez de Mayolo. *See Iowa Supr. Ct. Atty. Discipline Bd. v. Gottschalk*, No. 06-1885, 2007 WL 1029707, *1 n.1 (Apr. 6, 2007) (explaining that the Iowa Rules of Professional Conduct became effective on July 1, 2005).

**IT IS SO ORDERED.**

**DATED** this 16th day of April, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA